1

2

3    UNITED STATES DISTRICT COURT

4    FOR THE EASTERN DISTRICT OF CALIFORNIA

5

6    SUNG GON KANG, individually and on          No. 1:18-cv-01359-SKO
     behalf of others similarly situated,
7                                                **ORDER VACATING HEARING**
8              Plaintiff,
                                                 **ORDER GRANTING UNOPPOSED
9         v.                                     MOTION FOR FINAL APPROVAL OF
                                                 CLASS ACTION SETTLEMENT**
10   CREDIT BUREAU CONNECTION, INC.,
                                                 **ORDER GRANTING IN PART
11             Defendant.                        UNOPPOSED MOTION FOR
                                                 ATTORNEY'S FEES AND COSTS AND
12                                               FOR APPROVAL OF SERVICE AWARD
                                                 AND INDIVIDUAL SETTLEMENT**
13
                                                 (Docs. 155 & 158)
14

15

16       Pending before the Court is Plaintiff Sung Gon Kang ("Kang")'s unopposed motion for

17   final approval of a class action settlement and unopposed motion for attorney's fees and costs and

18   for approval of service award and individual settlement.  (Docs. 155 & 158.)  No objections to the

19   proposed settlement terms were received by the settlement administrator (*see* Doc. 158-1 at 23;

20   Doc. 158-2 ¶ 4) or filed with the Court.  Accordingly, the hearing for the motions, currently set for

21   October 25, 2023, will be vacated.

22       For the reasons explained below, the Court grants preliminary approval of the proposed

23   class action settlement and grants in part the motion for attorney's fees and costs and for approval

24   of service award and individual settlement.[1]

25               **I.      BACKGROUND**

26       The Court previously summarized Kang's allegations in its June 1, 2023, order granting

27

28   _____
     [1] On February 28, 2023, the parties consented to the jurisdiction of the U.S. Magistrate Judge.  (*See* Docs. 141–143.)

Kang's motion for preliminary approval of a class action settlement and conditional class certification (Doc. 153), and will not repeat the factual and procedural background in this order. Following the grant of preliminary approval in this action, on August 1, 2023, Kang filed the pending motion for attorney's fees and costs and for approval of service award and individual settlement, and on September 20, 2023, Kang filed the pending motion for final approval of the parties' class action settlement. (Docs. 155 & 158.)  In support of the motions, Kang has submitted declarations from class counsel and the settlement administrator in this action. (Docs. 155-2, 155-3, 158-2.)  As of the date of this order, no objections to the settlement were received by the settlement administrator or filed with this Court, and no class members have opted out of the settlement. (Doc. 158-1 at 23; Doc. 158-2 ¶ 4.)  Defendant Credit Bureau Connection, Inc. ("Credit Bureau") did not oppose either motion.

Under the settlement agreement, Credit Bureau will automatically pay $1,000 to each member of the FCRA Class without the need for any claim form or other response.[2]  (Doc. 149 at 16; Doc. 149-1 at 10, 16.)  This amount is "independent of [Credit Bureau's] other financial obligations under the proposed settlement.  That is, if the proposed settlement is approved, each FCRA Class member will receive a sum certain rather than a pro rata portion of a common fund against which, for example, the costs of notice and administration or Class Counsel's attorneys' fees and costs would be deducted." (Doc. 149 at 16.)

## II.        FINAL CERTIFICATION OF SETTLEMENT CLASS

On March 4, 2022, the Court granted certification of the proposed classes under Rule 23 and found that Kang had satisfied Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation and Rule 23(b)(3)'s requirements of predominance and superiority. (*See* Doc. 121.)

The Court's findings on these issues have not changed, and no objections to class certification were raised.  Accordingly, there is no need for the Court to repeat the analysis on these issues here. *See, e.g., Harris v. Vector Marketing*, No. C–08–5198 EMC, 2012 WL 381202 at *3,

---

[2] The "FRCA Class" is defined as "All individuals about whom [Credit Bureau] prepared a report that (1) included an OFAC 'Hit;' (2) was published to a third party from October 2, 2013 to March 4, 2022 and (3) included a U.S. address (including U.S. Territories) for that individual." (Doc. 149-1 at 5.)

at *7 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the court notes that it previously certified . . . a Rule 23(b)(3) class . . . . [Thus, it] need not analyze whether the requirements for certification have been met and may focus instead on whether the proposed settlement is fair, adequate, and reasonable."); *In re Apollo Group Inc. Securities Litigation*, No. CV 04-2147-PHX-JAT, 2012 WL 1378677 at *4 (D. Ariz. Apr. 20, 2012) ("The Court has previously certified, pursuant to Rule 23[,] . . . and hereby reconfirms its order certifying a class").

The Court hereby confirms its prior order and certifies the following settlement classes:

"All individuals about whom [Credit Bureau] prepared a report that (1) included an OFAC 'Hit;' (2) was published to a third party from October 2, 2013 to March 4, 2022 and (3) included a U.S. address (including U.S. Territories) for that individual" (the "FCRA Class").

"All individuals about whom [Credit Bureau] prepared a report that (1) included an OFAC 'Hit;' (2) was published to a third party from October 2, 2011 to March 4, 2022; and (3) included a U.S. address (including U.S. Territories) for that individual" (the "CCRAA Class").

(Doc. 153 at 3–4, 15.)  For settlement purposes, the parties have defined the class period as the period "from October 2, 2013 to March 4, 2022" for the FRCA Class and the period "from October 2, 2011 to March 4, 2022" for the CCRAA Class.[3]  (*See* Doc. 149-1 at 4, 5.)  These classes are comprised of an estimated 1,119 individuals (the "Settlement Class" or "Settlement Class Members"), all of whom are members of the CCRAA Class, and 1,071 of whom are members of the FCRA Class.  (Doc. 158-1 at 16, 26; Doc. 149-1 at 4.)

In addition, for the reasons stated in the certification order and the order of preliminary approval, Plaintiff Sung Gon Kang is confirmed as class representative; Caddell & Chapman, and Francis Mailman Soumilas, P.C., are confirmed as co-class counsel; and Continental Datalogix ("CDLx") is confirmed as the settlement administrator.  (Doc. 153 at 3, 15; Doc. 149-1 at 4, 6.)

### III.      FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Class actions require the district court's approval prior to settlement.  Fed R. Civ. P 23(e). To approve a settlement, a district court must: (i) ensure notice is sent to all class members; (ii) hold a hearing and make a finding that the settlement is fair, reasonable, and adequate; (iii) confirm

---

[3] The distinction between the two classes arises from the CCRAA's 7-year statute of limitations, Cal. Civ. Code § 1785.33, which is longer than the FCRA's 5-year statute of limitations, 15 U.S.C. § 1681p.

1    that the parties seeking approval file a statement identifying the settlement agreement; and (iv) be

2    shown that class members were given an opportunity to object.  Fed. R. Civ. P. 23(e)(1)–(5).

3        The parties filed the settlement agreement on May 1, 2023 (Doc. 149-1), and class members

4    were given an opportunity to object on or before August 31, 2023.  (Doc. 158-2 ¶ 3; *see also* Doc.

5    158-1 at 23.)  Neither CDLx nor the Court received any objections, timely or otherwise, to the

6    settlement.  (Doc. 158-2 ¶ 3; *see also* Doc. 158-1 at 23.)  The Court now turns to the adequacy of

7    notice and its fairness review of the settlement.

8    **A.**    **Notice**

9        Adequate notice of the class settlement must be provided under Rule 23(e).  *Hanlon v.*

10   *Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *see also Silber v. Mabon*, 18 F.3d 1449, 1453-

11   54 (9th Cir. 1994) (noting that the court need not ensure all class members receive actual notice,

12   only that "best practicable notice" is given); *Winans v. Emeritus Corp.*, No. 4:13-cv-03962-HSG,

13   2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort'

14   be made to reach all class members, it does not require that each individual actually receive

15   notice.").  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient

16   detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'"

17   *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson*

18   *Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)).  Any notice of the settlement sent to the

19   class should alert class members of "the opportunity to opt-out and individually pursue any state

20   law remedies that might provide a better opportunity for recovery."  *Hanlon*, 150 F.3d at 1025.

21       The Court previously reviewed the notice provided in this case at the preliminary approval

22   stage and found it to be satisfactory.  (Doc. 153 at 13–14.)  Class counsel filed the declaration of

23   Frank Barkan of CDLx in connection with the dissemination of the class notice.  (Doc. 156.)

24   Following the grant of preliminary approval, CDLx sent the notice to the class members by both

25   First-Class Mail and email.  (*Id.* ¶¶ 3–6.)  For mail that was returned as undeliverable with no

26   forwarding address, CDLx used an address locator service to find updated addresses.  (*Id.* ¶¶ 7–

27   10.)  In the end, CDLx delivered notice to 99.4% of the FCRA Class and 100% of the CCRA Class.

28   (*Id.* ¶ 11.)  The settlement administrator also maintained the website www.KangClassAction.com,

1   which made materials related to the settlement, class counsel's motion for attorney's fees and costs,

2   and relevant deadlines available to Class Members.  (*Id.* ¶ 12; *see also* Doc. 157.)  As of the filing

3   of the present motion, CDLx has received one telephone call from a class member and has received

4   and responded to seven email inquiries from class members.  (Doc. 158-2 ¶ 5.) Additionally, Credit

5   Bureau prepared the notice required to be served under the Class Action Fairness Act of 2005

6   ("CAFA"), 28 U.S.C. § 1715. S.A. § 4.1.4, and CDLx mailed the CAFA Notice as required by the

7   settlement agreement.  (*See* Doc. 152.)

8          Considering the foregoing, the Court accepts the reports of CDLx and finds that it provided

9   adequate notice, thereby satisfying Federal Rule of Civil Procedure 23(e)(1).  *Silber*, 18 F.3d at

10   1453–54; *Winans*, 2016 WL 107574, at *3.

11   **B.     Final Fairness Determination**

12          At the final approval stage, the primary inquiry is whether the proposed settlement "is

13   fundamentally fair, adequate, and reasonable."  Fed. R. Civ. P. 23(e)(2); *Lane v. Facebook, Inc.*,

14   696 F.3d 811, 818 (9th Cir. 2012); *Hanlon*, 150 F.3d at 1026.  "It is the settlement taken as a whole,

15   rather than the individual component parts, that must be examined for overall fairness."  *Hanlon*,

16   150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th

17   Cir. 1982)); *see also Lane*, 696 F.3d at 818.  Having already completed a preliminary examination

18   of the agreement, the Court reviews it again, mindful that the law favors the compromise and

19   settlement of class action suits.  *See, e.g.*, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir.

20   2008); *Churchill Vill.,* 361 F.3d at 576; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th

21   Cir. 1992); *Officers for Justice*, 688 F.2d at 625.  Ultimately, "the decision to approve or reject a

22   settlement is committed to the sound discretion of the trial judge because [they are] exposed to the

23   litigants and their strategies, positions, and proof."  *Staton v. Boeing Co*, 327 F.3d 938, 953 (9th

24   Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1026).

25          In assessing the fairness of a class action settlement, courts balance the following factors:

26          (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and
             likely duration of further litigation; (3) the risk of maintaining class action status
27           throughout the trial; (4) the amount offered in settlement; (5) the extent of
             discovery completed and the stage of the proceedings; (6) the experience and

28

5

views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964-67 (9th Cir. 2009). These settlement factors are non-exclusive, and each need not be discussed if they are irrelevant to a particular case. *Churchill Vill.,* 361 F.3d at 576 n.7.

Consideration of the *Churchill* factors alone is not sufficient to survive appellate review. *See Briseño v. Henderson*, 998 F.3d 1014, 1022-26 (9th Cir. 2021) (holding that the revised Rule 23(e) requires district courts "to go beyond our precedent" and mandates consideration of "the *Bluetooth* factors" to all class action settlements, regardless of whether settlement was achieved before or after class certification); *see also* Fed. R. Civ. P. 23(e)(2)(C)-(D). Under the revised Rule 23(e), "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements . . . to determine if collusion may have led to class members being shortchanged." *Briseño*, 998 F.3d at 1026. The so-called *Bluetooth* factors—also referred to as "subtle signs" of collusion—include: (i) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;" (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," or a provision under which defendant agrees not to object to the attorney's fees sought; and (iii) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotations and citations omitted). "The presence of these three signs is not a death knell— but when they exist, 'they require[] the district court to examine them, . . . develop the record to support its final approval decision,' and thereby 'assure itself that the fees awarded in the agreement were not unreasonably high.'" *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015)). Thus, while this Court has wide latitude to determine whether a settlement is substantively fair, it is held to a higher procedural standard, and in order "[t]o survive appellate review . . . [it] must show it has explored comprehensively all factors

and must give a reasoned response to all non-frivolous objections." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th Cir. 2021) (quoting *Allen*, 787 F.3d at 1223-24).

1.    Strength of Plaintiff's Case

When assessing the strength of a plaintiff's case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court cannot reach such a conclusion because evidence has not been fully presented. *Id.* Instead, the court "evaluate[s] objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id.*

As described in the motion for preliminary approval of the class settlement, Credit Bureau has affirmative defenses to some class members' claims and would argue that these defenses, and what Credit Bureau claimed were differences in the ways its consumer reports affected different class members, made the case unmanageable for trial. (*See* Doc. 153 at 12; *See also* Doc. 122 at 6–7.) Specifically, these liability defenses include "(1) Defendant is not a credit reporting agency because it does not provide its OFAC reports 'for monetary fees' within the meaning of the FCRA, (2) Defendant's OFAC reports are accurate, and (3) Defendant acted reasonably and not willfully." (*Id.* at 5.) Although Kang believes that there are strong arguments against each of the above positions, success on any one of Credit Bureau's defenses would have disposed of the class members' claims and eliminate any possibility of statutory damages recovery for the class.

Accordingly, the Court finds that consideration of this factor weighs in favor of granting final approval of the parties' settlement in this action.

2.    Risk, Expense, Complexity, and Likely Duration of Further Litigation, and Risk of Maintaining Class Action Status Throughout Trial

The second and third *Churchill* factors, the risk, expense, complexity, and likely duration of further litigation, and the risk of maintaining class action status throughout trial, weigh in favor of approval. *See* Fed. R. Civ. P. 23(e)(2)(C)(i). "[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA*

1    *Litig.*, 516 F.3d at 1101 (citing *Class Plaintiffs*, 955 F.2d at 1276).  As a result, "[a]pproval of

2    settlement is preferable to lengthy and expensive litigation with uncertain results."  *Johnson v.*

3    *Shaffer*, No. 2:12-cv-1059-KJM-AC, 2016 WL 3027744, at *4 (E.D. Cal. May 27, 2016) (citing

4    *Morales v. Stevco, Inc.*, No. 1:09-cv-00704-AWI-JLT, 2011 WL 5511767, at *10 (E.D. Cal. Nov.

5    10, 2011)).

6            Because of the above-described risks, Kang contends that further litigation would increase

7    risk and delay.  (Doc. 158-1 at 28.)  The proposed settlement "creates a much faster and direct

8    means of providing relief to Class Members than would be the case if the parties proceeded with

9    litigation," as the Scheduling Order contemplates completing merits and expert discovery, another

10   round of summary judgment briefing, and trial through October 24, 2023.  (*Id.*; *see also* Doc. 125.)

11           The Court finds that consideration of this factor weighs in favor of granting final approval.

12           3.      <u>Amount Offered in Settlement</u>

13           To evaluate the fairness of the settlement award, the court should "compare the terms of the

14   compromise with the likely rewards of litigation."  *Protective Comm. for Indep. Stockholders of*

15   *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *see also* Fed. R. Civ. P.

16   23(e)(2)(C)-(D).  "It is well-settled law that a cash settlement amounting to only a fraction of the

17   potential recovery does not *per se* render the settlement inadequate or unfair."  *In re Mego Fin.*

18   *Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  To determine whether a settlement "falls

19   within the range of possible approval," a court must focus on "substantive fairness and adequacy"

20   and "consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *In*

21   *re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  In addition, the court

22   must consider whether "the proposal treats class members equitably relative to each other" and

23   whether "the relief provided for the class is adequate."  Fed. R. Civ. P. 23(e)(2)(C)-(D).

24           Here, the settlement agreement provides that each of the 1,071-member FCRA Class will

25   receive a minimum of $1,000 without the need for any claim form or other response.  (Doc. 158-

26   1 at 28; Doc. 149-1 at 10, 16.)  This amounts to 95.7% of consumers about whom Credit Bureau

27   prepared a consumer report with an OFAC "Hit" during the class period receiving cash payments

28

1   via the proposed settlement.[4]

2       Under the FCRA a prevailing plaintiff may obtain statutory damages of $100–$1,000.  *See*

3   15 U.S.C. § 1681n(a)(1)(A).  Thus, the automatic $1,000 payment is the maximum amount of

4   statutory damages available for a willful violation of the FCRA.  Kang maintains that this is an

5   "excellent result" that "compares favorably to other FCRA section 1681e(b) class action

6   settlements for statutory damages."  (Doc. 158-1 at 28 (citing *Patel v. Trans Union, LLC*, No. 14-

7   CV-00522-LB, 2018 WL 1258194, at *8 (N.D. Cal. Mar. 11, 2018) (finally approving class action

8   settlement in which class members received an automatic $400 payment and could submit a claim

9   for an additional, pro rata share of a claims pool); *Leo v. AppFolio, Inc.*, No. 3:17-cv-05771-RJB,

10  Doc. 62 at 7 (W.D. Wash. July 18, 2019) ($425 for successful claimants); *McIntyre v. RealPage,*

11  *Inc.*, No. 18-CV-03934, 2023 WL 2643201, at *2 (E.D. Pa. Mar. 24, 2023) (finally approving

12  settlement in which class members received automatic payments of approximately $300)).  In

13  addition, members of the largely overlapping CCRAA Class all benefit from Credit Bureau's

14  practice changes that eliminate name-only matching for entities on the OFAC list.  (*See* Doc. 158-

15  1 at 29.)

16      Based on the information presented, the Court concludes that the amount offered in

17  settlement of this action provides adequate relief for the class.

18          4.   Extent of Discovery Completed and Stage of the Proceedings

19      "In the context of class action settlements, 'formal discovery is not a necessary ticket to the

20  bargaining table' where the parties have sufficient information to make an informed decision about

21  settlement."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re*

22  *Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).  Approval of a class action settlement

23  "is proper as long as discovery allowed the parties to form a clear view of the strengths and

24  weaknesses of their cases."  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D. Cal.

25  2013).  A settlement is presumed fair if it "follow[s] sufficient discovery and genuine arms-length

26  negotiation."  *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting

27

28  _____
    [4] The remaining consumers are members of the CCRAA Class, who are entitled to only injunctive relief.

1    *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  The

2    court must consider whether the process by which the parties arrived at their settlement is truly the

3    product of arm's length bargaining and not collusion or fraud.  *Millan v. Cascade Water Servs.,*

4    *Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  These concerns are also reflected in Rule 23(e)(2)'s

5    focus on procedural fairness—whether "the class representatives and class counsel have adequately

6    represented the class" and whether "the proposal was negotiated at arm's length."  Fed. R. Civ. P.

7    23(e)(2)(A)-(B).

8           As detailed in the Court's order granting preliminary approval, the Court is satisfied that

9    the settlement was the result of "serious, informed, non-collusive negotiations."  (Doc. 153 at 9.)

10   The parties engaged in three mediation sessions prior to settlement.  (Doc. 158-1 at 13, 15–16.)

11   The final mediation took place after motion practice, the completion of class certification discovery

12   and completion of "much of [the] merits discovery."  (*Id.* at 29.)  Class Counsel had identified all

13   possible class members who met the definitions certified by the Court, had obtained the computer

14   code behind Credit Bureau's "name-only matching logic," and had already retained experts in

15   OFAC and computer programing and databases.  (*Id.*)  In the settlement agreement, the parties

16   recite that the settlement was reached after the parties "engaged in vigorous litigation, exchanged

17   voluminous discovery, documents, and information, and conducted multiple depositions, and it is

18   the product of sustained, arm's length settlement negotiations and two (2) formal mediations."

19   (Doc. 149-1 at 3.)

20          Accordingly, the Court concludes that consideration of this factor weighs in favor of

21   granting final approval.

22          5.      Experience and Views of Counsel

23          Class counsel submitted declarations describing their experience in class action litigation.

24   (*See* Docs. 155-2 & 155-3.)  They have "decades of experience in the area of consumer class actions

25   in general, especially those brought under the FCRA in particular, and have been commended by

26   federal courts throughout the country over many years for their litigation proficiency, expertise and

27   high caliber of work."  (Doc. 158-1 at 29.  *See also* Docs. 155-2 & 155-3.)  In their view, the

28   proposed settlement "provides adequate relief to Class Members, including the maximum amount

of statutory damages available under the FCRA for a 5-year class as well as valuable practice changes." (*Id*. at 29–30.)

The Court finds that class counsel's experience and views weigh in favor of granting final approval.

### 6. Presence of a Governmental Participant

As no government entity has participated in this matter, this factor is neutral.

### 7. Reaction of the Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529 (citing cases). The presumption that a settlement is fair, reasonable, and adequate is particularly strong when there is an absence of a single objection to a proposed class action settlement. *See id.*; *Barcia v. Contain-A-Way, Inc.*, No. 3:07-cv-00938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. Mar. 6, 2009). Nevertheless, "[a] court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Cruz v. Sky Chefs, Inc.*, No. 4:12-cv-02705-DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) (citing *Churchill Vill.*, 361 F.3d at 577).

According to Kang, no Class Member has filed an objection to the settlement pending final approval. (Doc. 158-1 at 23; Doc. 158-2 ¶ 4.) As a result, currently 100% of the class members will be participating in the settlement. (*Id.*) Accordingly, consideration of this factor weighs in favor of granting final approval.

### 8. Subtle Signs of Collusion

The Court now turns to the *Bluetooth* factors to examine whether any "more subtle signs" of collusion recognized by the Ninth Circuit are present here.[5] *See Bluetooth*, 654 F.3d at 947.

For the first *Bluetooth* factor, the Court compares the payout to the class (actual and expected) to class counsel's unopposed claim for fees. *See Harris v. Vector Mktg. Corp.*, No. C–08–5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011). The gross settlement amount is $2.75 million and class counsel seeks $1.62 million in attorney's fees—58.9 percent of the

---

[5] Plaintiff's briefing does not address these factors.

settlement amount.  This ratio alone can be a sign of collusion.  *See Bluetooth*, 654 F.3d at 947.
However, given that the fees requested are less than class counsel's lodestar, the Court finds that
while the high percentage is a red flag, it does not rise to the level of collusion.  Moreover, any
concerns regarding collusion are mitigated by the Court's reduction of the fees sought, as set forth
below.

As for the second *Bluetooth* factor, the fact that the proposed settlement contains a "clear
sailing" provision (*see* Doc. 149-1 at 15) is not ideal.  *See In re Toys R Us-Delaware, Inc.–Fair
and Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a
clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be
awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").
Nevertheless, the existence of a such a provision is not necessarily fatal to final approval.  *See
Bluetooth*, 654 F.3d at 948.  The collusion concerns raised by the clear sailing provision are
minimized, in this case, however, because the settlement agreement provides that any unpaid
attorney's fees and costs will remain in the settlement fund to be distributed to the class in a second
distribution following the initial round of automatic payments (Doc. 149-1 at 15–16).  *See, e.g.,
Ferrell v. Buckingham Prop. Mgmt.,* No. 1:19-cv-00332-LJO-SAB, 2020 WL 291042, at *21 (E.D.
Cal. Jan. 21, 2020).  Moreover, class counsel did assume substantial risk in litigating this action on
a contingency fee basis, and incurring costs without the guarantee of payment for its litigation
efforts.  That risk is even more acute under the circumstances, as class members' statutory recovery
under the FCRA is capped at $1,000 in statutory damages for each member of a class.  *See* 15
U.S.C. § 1681n(a)(1)(A).  The attorney's fees and costs necessary to litigate an FCRA class action
thus may often exceed any possible recovery.  *See, e.g., Der-Hacopian v. Darktrace, Inc*., No. 18-
CV-06726-HSG, 2020 WL 1904471, at *8 (N.D. Cal. Apr. 17, 2020).

The third *Bluetooth* factor—whether the parties have arranged for fees not awarded to the
class to revert to defendant rather than be added to the settlement fund, see *Bluetooth*, 654 F.3d at
948—is not present here.  As set forth above, the settlement agreement is non-reversionary.  All
funds that are not distributed to the class following the second distribution shall be paid to a *cy pres*
recipient.  (Doc. 149-1 at 16.)

9. Conclusion

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied that the settlement agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. There are no objections to address. For each of these reasons, the Court finds that the settlement is fair, reasonable, and adequate under Rule 23(e) and final approval is therefore appropriate.

## IV. ATTORNEY'S FEES, COSTS, AND SERVICE AWARD

As noted above, Plaintiff has also submitted a motion seeking attorney's fees, class counsel's litigation expenses, and a service award for Kang.

**A. Attorney's Fees**

1. Legal Standard

Reasonable attorney's fees are allowed under the FCRA, 15 U.S.C. § 1681n(a)(3), and Federal Rule of Civil Procedure 23(h). However, "courts have an independent obligation to ensure that the [fee] award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Staton*, 327 F.3d at 963 ("[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement."). Use of the "lodestar" method is appropriate to calculate attorney's fees under a federal fee-shifting statute like the FCRA. *See Tahara v. Matson Terminals, Inc*., 511 F.3d 950, 955 (9th Cir. 2007); *see also Staton*, 327 F.3d at 965; *Yeagley v. Wells Fargo & Co*., 365 F. App'x 886, 887 (9th Cir. 2010) ("Under a fee shifting statute such as the FCRA . . . the lodestar method is generally the correct method for calculating attorneys' fees.").

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida v. Dunne*, 915 F.2d 542, 545 n.3 (9th Cir. 1990) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 978 (9th Cir. 2008). Next, the Court may adjust the lodestar upward or

downward using a "multiplier" considering factors adopted by the Ninth Circuit:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.[6]

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) (indicating the Court should "consider[] some or all twelve relevant criteria set forth in *Kerr*" to determine whether to deviate from the lodestar).

### 2.    Evaluation of the Fees Requested

Pursuant to the proposed settlement, class counsel may seek attorney's fees and costs in the amount of $1,620,000.  (Doc. 149-1 at 15.)  Class counsel assert this amount is "reasonable" because it amounts to 91.3% of their total lodestar expended in prosecuting this matter, $1,690,145.50.  (Doc. 155-1 at 17, 21.)  For the reasons that follow, the Court finds that the lodestar in this case is excessive, both with the time included and hourly rates applied, and necessitates a reduction in attorney's fees awarded.

#### a.    *Time expended*

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable.  *Fischer*, 214 F.3d at 1119.  The Court has the discretion to review submitted time sheets to determine whether the time expended was reasonable.  *See In re Washington Public Power Supply System Securities Litigation,* 19 F.3d 1291, 1298 (9th Cir.1994) (concluding the district court acted within its discretion in reducing the lodestar for unnecessary and duplicative work).

The Court has reviewed the billing records provided by class counsel Francis Mailman Soumilas, P.C. ("FMS") and Caddell & Chapman ("C&C").  (Doc. 155-2 at 16–73; Doc. 155-3 at

---

[6] The Ninth Circuit has since determined the "desirability" of a case is no longer a relevant factor.  *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

14

22–109.)  The reported combined 2,492.7 hours (1,480.8 by FMS + 1,011.9 by C&C) included: pre-suit investigation of the case and claims; preparation of the pleadings and service; communications with Kang and opposing counsel; discovery; motion practice; settlement conferences; and class notices and administration.  However, the Court's review of the billing records to determine the tasks undertaken by the law firms has also revealed the inclusion of clerical tasks and a significant amount of time billed for internal communications.

i.  *Clerical tasks*

The Supreme Court determined that "purely clerical or secretarial tasks should not be billed at a paralegal or [lawyer's] rate, regardless of who performs them."  *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  As a result, courts eliminate clerical tasks from lodestar calculations.  *See, e.g., Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *Marquez v. Harper Sch. Dist.,* 546 F. App'x 659, 660 (9th Cir. 2013) ("[t]he district court was within its discretion" when it declined to award fees for clerical tasks); *Harris v. L & L Wings, Inc.,* 132 F.3d 978, 985 (4th Cir. 1997) (approving the deduction of hours spent on secretarial tasks from the lodestar calculation); *see also Weeks v. Kellogg Co.*, No. CV 09–08102(MMM)(RZx), 2013 WL 6531177, at *32 (C.D. Cal. Nov. 23, 2013) ("In calculating the lodestar, courts typically exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of an attorney's overhead and are reflected in his or her hourly rate.").  Such tasks may include, but are not limited to, "creating indexes for a binder; filing emails, memoranda, and other correspondence; updating the case calendar with new dates; copying, scanning, and faxing documents; and filing or serving documents."  *Moore v. Chase, Inc*., Case No. 1:14-cv-01178-SKO, 2016 WL 3648949, at *3 (E.D. Cal. July 7, 2016), citing *Prison Legal News v. Schwarzenegger*, 561 F.Supp.2d 1095, 1102 (N.D. Cal. 2008).

a)  Calendaring and Document Retrieval/Compilation

This Court and others in the Ninth Circuit have determined that calendaring deadlines are clerical tasks that should not being included in a fee award.  *See, e.g., Moore*, 2016 WL 3648949, at *3; *Hill v. Comm'r of Soc. Sec.*, 428 F. Supp. 3d 253, 265 (E.D. Cal. 2019) (observing clerical staff could "easily" complete "calendaring of court dates" and reducing the fee award); *Campbell v. AMTRAK*, 718 F.Supp.2d 1093, 1105 (N.D. Cal. 2010) (deducting calendaring as clerical work

from the fee award); *Doran v. Vicorp Rests., Inc.*, 407 F.Supp.2d 1120, 1125 (C.D. Cal. 2005) (noting "calendaring court dates" is clerical and reducing the fee award).  Likewise, tasks related to scheduling are clerical, non-compensable tasks.  *See Soler v. County of San Diego,* No. 14cv2470-MMA (RBB), 2021 WL 2515236, at \*10 (S.D. Cal. June 18, 2021) (identifying "time spent scheduling ... [as] clerical tasks non-compensable at any billing rate").

Courts have also declined to award fees for "retrieving electronic court documents or copying" due to the clerical nature of the tasks.  *Jones v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 1016, 1027 (N.D. Cal. 2012); *Schmidt v. City of Modesto*, No. 1:17-cv-01411-DAD-MJS, 2018 WL 6593362, at \*9 (E.D. Cal. Dec. 18, 2018) (indicating clerical work included downloading, saving, and printing documents).  Similarly, courts decline to award fees for staff emailing documents.  *See Schmidt*, 2018 WL 6593362, at \*9 (declining to award fees for emailing documents, noting emailing was a clerical task rather than a paralegal task); *LaToya A. v. S.F. Unified Sch. Dist.*, Case No. 3:15-cv-04311-LB, 2016 WL 344558, at \*9 (N.D. Cal. Jan. 28, 2016) (forwarding documents to attorneys is "purely clerical work").  Thus, to the extent the billing records include such tasks, fees for such tasks should not be awarded.

Review of class counsel's billing records shows that paralegals at FMS and C&C included over 30 entries for calendaring, noting deadlines, and compiling and retrieving documents.[7]  (*See generally* Doc. 155-2 at 16–73; Doc. 155-3 at 22–109.)  For example, an unnamed FMS paralegal[8] billed a total of 9.3 hours throughout the litigation, from October 4, 2018, to September 8, 2021, for tasks such as "[d]ownload Court order[s], read and identify case deadlines contained therein, [and] add and/or modify case deadlines on litigation calendar."  (*See* Doc. 155-2 at 22–24, 26–28, 30–31, 33, 35–36, 51.)  Similarly, Kathy Kersh, senior paralegal at C&C, billed a total of 6.8 hours from March 7, 2019, to April 10, 2023, for tasks such as reviewing Court orders, updating calendars, creating calendar entries, updating the "case management notebook," and downloading documents to the firm's "network."  (*See* Doc. 155-3 at 34, 35, 45, 53, 54, 65, 70–71, 80, 83, 93,

---

[7] FMS appears to acknowledge the expenditure of administrative time on this matter, as they seek 18.7 hours categorized as "File Admin."  (*See* Doc. 155-2 ¶ 24.)

[8] Although identified only as "Paralegal" in its billing records, Mr. Francis's declaration names Jeffrey Kabacinski as the paralegal who worked on this matter at FMS.

96, 98, 105.)

Associate Jordan Sartell of FMS and Junior Partner Amy Tabor of C&C also billed for administrative tasks related to calendaring, scheduling, and document compilation in this action. For example, Mr. Sartell indicated that he spent 0.2 hour on May 8, 2020, to "review ECF 68 setting discovery dispute teleconference, [and] calendar same"; 0.2 hour on April 8, 2020, to "review ECF 103, [and] calendar MCC-related deadlines"; 0.3 hour on September 6, 2022, to "review Def's R 45 subpoena, [and] related calendar items"; and 0.4 hour on December 20, 2022, to "review ECF 134, setting forth court's instructions and deadlines for 3/9/23 settlement conference; [and] calendar interstitial deadlines." (*See* Doc. 155-2 at 40, 46, 59, 63.)  Similarly, Ms. Tabor billed 0.1 hour on November 12, 2019, to "[r]eview order vacating hearing [and] calendar deadlines"; 1.5 hours on December 2, 2020, to "[r]eview filings; assemble notebook for motion for summary judgment hearing; [and] calendar deadlines"; and 0.2 hours on March 11, 2021, to "[r]eview notice of motion to compel [and] calendar deadlines." (*See* Doc. 155-3 at 56, 79, 81.)  Such time will also be deducted from the lodestar calculation as clerical work.  *See Henry v. Comm'r of Soc. Sec. Admin.*, No. CV-20-00320-TUC-JGZ, 2023 WL 1434332, at *6 (D. Ariz. Feb. 1, 2023) ("Communications such as emails and conferences may be considered clerical tasks when the discussion is about deadlines, filings, and other non-substantive administrative work"); *Mrkonjic v. Delta Family-Care*, No. CV 10-2087 GAF (JCx), 2014 WL 12967579 (C.D. Cal. July 18, 2014) (explaining correspondence regarding deadlines is clerical and "not compensable" [citation omitted]).

Based upon the Court's review of billing entries related to calendaring, scheduling, and the assembly of documents, the Court finds 19.0 hours must be deducted from the lodestar, including 9.3 hours for Jeffrey Kabacinski, 6.8 hours for Kathy Kersh, 1.1 hour for Jordan Sartell, and 1.8 hours for Amy Tabor.

b)      Communications with the Court

This Court and others have declined to award fees for communicating with the Court—such as emailing or calling courtroom deputy—due to the clerical nature of the task.  *See, e.g., Miller v. Schmidt*, No. 1:12-cv-00137-LJO-SAB, 2017 WL 633892, at *7 (E.D. Cal. Feb. 15, 2017) (agreeing with the party opposing the fee request that "communicating with the Court staff and court reporters

17

is purely clerical work" and excluding the time billed for communications with the courtroom deputies from a fee award); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099-1100 (D. Haw. 2010) ("communication with court staff, scheduling, and corresponding regarding deadlines, are clerical and not compensable [tasks]"); *Comcast of Illinois X v. Kwak*, 03–00962 DAE–PAL, 2010 WL 3781768, at *6 (D. Nev. Sept. 20, 2010) (declining to award fees for "ministerial tasks such as contacting court staff for scheduling reasons or noting due dates").

Michael Caddell of C&C billed 0.2 hour to email the Court, and to review responses, on June 12, 2019; 0.1 hour to review email correspondence from the Court on December 6, 2019; 0.6 hour to review correspondence to and from the Court on May 1, 2020; and 0.4 hour to email the Court, and to review responses, on March 31, 2021.  (Doc. 155-3 at 46, 58, 70, 82.)  Similarly, Jordan Sartell of FMS billed 0.6 hour to "confer with [co-counsel, opposing counsel,] and courtroom deputy re tomorrow's scheduling conference" on June 12, 2019; and 0.2 hour to "[r]eview ECF 100 re logistics for upcoming scheduling conference [and]respond to deputy as ordered" on March 31, 2021.  (Doc. 155-2 at 33, 46.)  This time shall be deducted from the lodestar, for a total deduction of 2.1 hours.

*ii.*     *Unnecessary (unrelated) tasks*

The Court takes judicial notice that a version of this case was originally filed on May 11, 2018, in the Central District of California against Experian Information Solutions, Inc. ("Experian")[9]  *See Kang v. Experian Information Solutions, Inc*., Case No. 8:18-cv-00830-CJC-DFM (C.D. Cal.).  The cases are similar, but the legal theories, facts, and claims differ.  (*Compare Kang,* Doc. 1, Case No. 8:18-cv-00830-CJC-DFM (C.D. Cal.) *with* Doc. 1.)  On July 5, 2018, the case was voluntarily dismissed without prejudice.  (*See Kang,* Doc. 15, Case No. 8:18-cv-00830-CJC-DFM (C.D. Cal.).  From what the Court has gathered from class counsel's billing records,[10] Kang dismissed his case against Experian after it was discovered that he had named the wrong

---

[9] A court "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue."  *United States ex rel. v. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).  *See also* Fed. R. Evid. 201

[10] Notably, Kang makes no mention of his prior case in his briefing.  It does explain, however, why class counsel's billing records begin almost one year before the complaint in this case was filed.

defendant. (*See generally* Doc. 155-2 at 18–20; Doc. 155-3 at 22–26.)

While the Court acknowledges that time spent on preparing and litigating Kang's case against Experian may have saved some time on this case, it is not clear that ***all*** of the time spent litigating against the wrong defendant based on a different legal theory and claims in another venue was necessary to the prosecution of this case. *See, e.g., Buchannon v. Associated Credit Servs., Inc.*, No. 3:20-CV-02245-BEN-LL, 2021 WL 5360971, at *18–20 (S.D. Cal. Nov. 17, 2021) (reducing attorney's fees for time spent litigating lawsuit filed in wrong venue). *See also Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003) ("Hours expended on unrelated, unsuccessful claims should not be included in an award of fees."). Accordingly, the Court in its discretion will reduce by 50% the time expended by FMS from November 21, 2017, through July 5, 2018, and time expended by C&C from May 8, 2018, through July 5, 2018, as follows:

| Legal Professional | Deducted Hours |
|---|---|
| Michael A. Caddell | 5.85 (11.7 x .5) |
| Cynthia B. Chapman | 4.0 (8.0 x .5) |
| James A. Francis | 3.2 (6.4 x .5) |
| John Soumilas | 2.9 (5.8 x .5) |
| Amy E. Tabor | 6.9 (13.8 x .5) |
| Jordan M. Sartell | 11.45 (22.9 x .5) |
| Lauren KW Brennan | 6.0 (12.0 x .5) |
| Kathy Kersh | 6.6. (13.2 x .5) |
| Jeffrey Kabacinski (FMS Paralegal) | 1.0 (2 x .5) |
| Felicia Labbe | 1.15 (2.3 x .5) |

In addition, the Court does not include the 28.5 hours billed by Mr. Francis for attendance at a final approval hearing (*see* Doc. 155-2 at 73), as none was held in this case.

### b.    *Hourly rates*

The Court must also determine whether the hourly rates are reasonable to calculate the lodestar. *See Florida*, 915 F.2d at 545 n.3. The Supreme Court has explained attorney fees are to be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895–96 and n.11 (1984). In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Thus, when a case is filed in the Fresno

Division of the Eastern District of California, the Fresno Division of the District "is the appropriate forum to establish the lodestar hourly rate . . ." *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).  *See also Felix v. WM. Bolthouse Farms, Inc*., No. 1:19-cv-00312-AWI-JLT, 2020 WL 3819414, at *1 (E.D. Cal. July 8, 2020) ("This Court sits in the Fresno Division of the Eastern District of California.  The prevailing rates outside of the Fresno Division, including the prevailing rates for the Sacramento Division, are generally irrelevant.").

The fee applicant bears a burden of establishing that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11.  Applicants meet this burden by producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110–11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate").  The Court may apply "rates [from] outside the forum . . . 'if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case.'" *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).

To calculate their lodestar, class counsel applied hourly rates ranging from $465 per hour for associates to $1,075 per hour for a senior partner.  (*See* Doc. 155-1 at 19.)  Class counsel also seek hourly rates for their paralegals ranging from $375 to $175 per hour .  (*Id.*)  Class counsel do not assert the requested rates are aligned with the market rate in the Fresno Division or provide any evidence concerning their hourly rates or those of other attorneys in the community.  They do not contend that counsel was unavailable in Fresno.[11]  They instead assert that the rates are "reasonable and within the range of the appropriate market rates charged by attorneys with comparable

---

[11] Class counsel assert that "most local legal communities do not have lawyers with the relevant experience" (Doc. 155-1 at 19) but do not go as far as to claim that ***Fresno*** is one of those communities.

1   experience levels for litigation of a similar nature, given their experience level, practice

2   concentration and background." (Doc. 155-2 ¶ 26. *See also* Doc. 155-3 ¶ 36 (C&C's hourly rates

3   are "consistent with market rates for complex class action litigation.").)

4          In support of its rates, FMS cites an October 18, 2022, expert report from Abraham C. Reich

5   of Fox Rothschild, LLP recommending the hourly rates to be charged by FMS in each of the legal

6   markets in which the firm has an office, and asserts that "[c]ourts across the country have relied

7   upon Mr. Reich's expert opinion to approve [FMS's] hourly rates." (Doc. 155-2 ¶ 26 (citing

8   cases).) As Fresno is not one the markets discussed in the report, and none of the cited court cases

9   that relied on the report are venued in the Fresno Division, the rates recommended therein are

10  "irrelevant." *Felix*, 2020 WL 3819414, at *1.

11         C&C similarly relies on cases from other forums to support the assertion the Court should

12  adopt the hourly rates they identified. (*See* Doc. 155-3 ¶ 36 (citing *Hooker v. Sirius SM Radio,*

13  *Inc.*, No. 4:13-cv-0003, Dkt. 215 (E.D. Va. May 11, 2017; *Henderson v. Acxiom Risk Mitigation*,

14  No. 3:12-cv-0589 (E.D. Va. 2015); *Brown v. Lowe's*, No. 5:13-cv-0079, Dkt. 173 (W.D.N.C.

15  November 1, 2016); *Berry v. LexisNexis Risk & Info Analytics Group, Inc.*, No. 3:11-cv-0754, Dkt.

16  129 (E.D. Va. Sept. 5, 2014); *United States of America, ex rel. Ivey Woodard v. DaVita Inc.*, Civil

17  Case No. 1:05-cv-0227, Dkt. 195-1 ¶ 51 (E.D. La.)).) However, as the matter is pending in the

18  Fresno Division of the Eastern District, the identified actions from federal courts in Virginia, North

19  Carolina, and Louisiana do not assist *this* Court.[12] *Jadwin*, 767 F. Supp. 2d at 1129. Plaintiff has

20  not provided adequate evidentiary support to demonstrate that the use of an attorney from outside

21  the relevant community was necessary for purposes of charging another community's higher hourly

22  rates. *See, e.g., Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945–46 (9th Cir.2007) (the party

23  seeking fees "bears the burden of documenting the hours expended in the litigation and must submit

24  evidence supporting those hours and the rates claimed.") (emphasis added) (citation omitted).

25

26

---

27  [12] The Ninth Circuit's decision in *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010), on which
class counsel rely, does not alter this analysis. Rather, it reinforces the principle that, when determining a reasonable
28  hourly for an attorney fee award, the "scope of comparison," while not limited to subject matter, is confined to
"attorneys in the ***relevant community***." *Id.* (emphasis added).

1

*i.        Attorneys*

2      James Francis of FMS reports that he has practiced law for 28 years, and his partner, John

3  Soumilas, has 24 years of experience.  (Doc. 155-2 ¶ 31.)  FMS associates Jordan Sartell and Lauren

4  Brennan each have 11 years of experience.  (*Id*.)  C&C senior partner Michael Caddell reports that

5  he has practiced law for 44 years, and senior partner Cynthia Chapman has practiced for 33 years.

6  (Doc. 155-3 ¶ 34.)  Amy Tabor, junior partner at C&C, has 20 years of experience.  (*Id*.)  The

7  hourly rates requested for these attorneys exceed those typically awarded in the local forum.

8      The Court has performed a comprehensive survey of attorney fees awarded in the Eastern

9  District and finds current hourly rates range from $200 to $750, with hourly rates exceeding $600

10  reserved for attorneys who have been practicing approximately 30 years.  *See, e.g., Cianchetta v.*

11  *BMW of N. Am., LLC*, No. 2:20-cv-00241-KJM-JDP, 2022 WL 2160556, at *6 (E.D. Cal. June 13,

12  2022) (reducing the hourly rate for attorneys in their first year of practice to $200); *Seebach v.*

13  *BMW of N. Am., LLC*, No. 2:18-cv-00109-KJM AC, 2020 WL 4923664 at *3 (E.D. Cal. Aug. 21,

14  2020) (awarding the hourly rates of $200 for an attorney who had been admitted to practice less

15  than two years, and $505 for an attorney "with roughly 20 years of experience" in 2020); *Siafarikas*

16  *v. Mercedez- Benz USA, LLC*, No. 2:20-cv-01784-JAM-AC, 2022 WL 16926265, at *3 (E.D. Cal.

17  Nov. 10, 2022) (approving the hourly rate of $250 for an attorney "who has practiced law for three

18  years" and $500 for an attorney who had practiced law for 21 years); *Garybo v. Leonardo Bros*,

19  No. 1:15-cv-01487-DAD-JLT, 2021 WL 4493502, at *5 (E.D. Cal. Sept. 30, 2021) (adopting the

20  recommended hourly rate of $500 for attorneys who were admitted to practice for 20 years or more

21  to calculate a lodestar); *Mostajo v. Nationwide Mut. Ins. Co.*, No. 2:17-cv-00350-DAD-AC, 2023

22  WL 2918657, at *11 (E.D. Cal. Apr. 12, 2023) (approving of "hourly rates ranging from $650

23  through $750" for "attorneys with over thirty years of experience" for purposes of calculating a

24  lodestar); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2021 WL 5139613, at *6 (E.D. Cal.

25  Nov. 4, 2021) (calculating the lodestar using the rate of $695 for attorneys with 30 years'

26  experience).  With these parameters in mind, the hourly rates for counsel must be adjusted to those

27  of the local forum.

28

The rates for attorneys practicing 30 years or more—including Michael Caddell and Cynthia Chapman—will be calculated at the rate of $750 and $650 per hour, respectively.  The rate for attorneys practicing law for 20 years or more—including Amy Tabor, John Soumilas, and James Francis—will be calculated at the rate of $525 per hour.  The rate for Jordan Sartell and Lauren Brennan, who have been practicing for 11 years, will be adjusted to $425 per hour.

*ii.*       *Paralegals*

To calculate their lodestar, class counsel applied the following hourly rates for their paralegals: $375 for Kathy Kersh of C&C, who has 33 years of experience; $305 for FMS paralegal Jeffrey Kabacinski, who has 25 years of experience; and $175 for Felicia Labbe of C&C, who has 13 years of experience.  (*See* Doc. 155-2 ¶ 31; Doc. 155-3 ¶ 34.)  These amounts exceed the hourly rates for comparably experienced paralegals in the Eastern District.

Paralegal rates within the Eastern District range from $75 to approximately $150.00 per hour, depending on experience.  *See, e.g., Schmidt*, 2018 WL 6593362, at *6 ("the reasonable rate of compensation for a paralegal would be between $75.00 to $150.00 per hour depending on experience"); *Bernal v. Sacramento Cty. Sheriff Dep't*, No. 2:19-cv-00482-MCE-AC, 2023 WL 2504895, at *5 (E.D. Cal. Mar. 14, 2023) (rates of "approximately $100 per hour" were reasonable for paralegals in this district); *Gilbert v. Jabar Wireless Inc.*, No. 2:21-cv-02055 DAD AC, 2023 WL 3055108, at *9 (E.D. Cal. Apr. 24, 2023) (finding the hourly rate of $115 was reasonable for "experienced paralegals"); *Block v. Narwal*, No. 1:22-cv-00597-ADA-EPG, 2022 WL 17455502, at *9 (E.D. Cal. Dec. 6, 2022) (finding the requested rate of $115 was reasonable for paralegals who had more than ten years of experience); *Freshko Produce Servs. v. ILA Prods,* No. 1:19-cv-00017-DAD-BAM, 2021 WL 4033176, at *4 (E.D. Cal. Sept. 2, 2021) (finding $150 per hour was reasonable "for a paralegal with more than 30 years of experience" for calculating a lodestar).

In accordance with the foregoing, the rate for paralegal with 20 years or more experience—including Kathy Kersh and Jeffrey Kabacinski—will be calculated at the rate of $150 per hour.  The rate for Felicia Labbe, with 13 years of experience, will be adjusted to $115 per hour.

3.       Amount of Fees to be Awarded

Based upon the survey of fees awarded in the Eastern District and the Court's own

knowledge, the adjusted rates are reasonable and align with prevailing local market rates.  *See Cianchetta*, 2022 WL 2160556, at *6; *Garybo*, 2021 WL 449350, at *5; *see also Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).   With the time and hourly adjustments set forth above, the lodestar totals $1,113,560.50:

| Legal Professional | Time | Rate | Lodestar |
|---|---|---|---|
| Michael A. Caddell | 313.45 | $750 | $235,087.50 |
| Cynthia B. Chapman | 137.6 | $650 | $89,440 |
| James A. Francis | 216.3 | $525 | $113,557.50 |
| John Soumilas | 228.7 | $525 | $120,067.50 |
| Amy E. Tabor | 354.1 | $525 | $185,902.50 |
| Jordan M. Sartell | 700.65 | $425 | $297,776.25 |
| Lauren KW Brennan | 20.9 | $425 | $8,882.50 |
| Kathy Kersh | 157.9 | $150 | $23,685 |
| Jeffrey Kabacinski | 250 | $150 | $37,500 |
| Felicia Labbe | 14.45 | $115 | $1,661.75 |
| **Total** | | | **$1,113,560.50** |

Because the requested fees in the amount of $1,620,000 (less $77,613.38 in requested costs) exceed the adjusted lodestar by almost $500,000, the lodestar does not support the reasonableness of the request.  Rather, in view of the presumptive reasonableness of the lodestar figure, *Gonzalez*, 729 F.3d at 1202, and in the absence of any strong justification for an upward adjustment under the factors articulated in *Kerr v. v. Screen Extras Guild, Inc.*, the Court finds the adjusted lodestar amount is fair, reasonable, and adequate as required under Rule 23.[13]  Accordingly, the request for fees will be granted in the modified amount of $1,113,560.50.

**B.**    **Litigation Costs**

"[A]n attorney who has created a common fund for the benefit of the class is entitled to

---

[13] The only *Kerr* factor discussed by Kang in his briefing is the "benefit obtained by the class."  (*See* Doc. 155-1 at 21.)  While the Court agrees that the classes obtained a substantial benefit in having obtained the maximum amount of statutory damages and practice changes, it also observes that the fee award is still a substantial percentage (40.5%) of the total amount Credit Bureau has agreed to pay to settle this case, and in fact exceeds the $1,071,000 automatic payment to the FRCA Class.  In this way, the Court's determination is in line with other district court decisions, cited by Kang, approving fee requests in FCRA actions that comprise large percentage of the settlement amount in view of the "unique properties of FCRA actions."  *Arnold v. DMG Mori USA, Inc*., No. 18-CV-02373-JD, 2022 WL 18027883, at *5 (N.D. Cal. Dec. 30, 2022) (collecting cases).  *See also* Doc. 158-1 at 20 n.11.

24

reimbursement of reasonable litigation expenses from that fund." *Norris v. Mazzola*, No. 15-cv-04962-JSC, 2017 WL 6493091, at *14 (N.D. Cal. Dec. 19, 2017) (citation and internal quotation marks omitted); *Smith v. Am. Greetings Corp*., No. 14-cv-02577-JST, 2016 WL 2909429, at *9 (N.D. Cal. May 19, 2016) ("An attorney is entitled to 'recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client.'") (quoting *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)).

Pursuant to the settlement agreement, class counsel was authorized to seek up to $1,620,000 in attorney's fees and costs from the gross settlement fund. (*See* Doc. 149-1 at 10, 15.) Class Counsel now seek litigation expenses in the amount of $77,613.38. (Doc. 155-1 at 21.) The itemized costs include filing fees, copying and postage, mediation fees, expert costs, legal research charges, document review, and travel expenses for depositions and mediations. (*See* Doc. 155-2 ¶¶ 35–36; *id*. at 75–76.; Doc. 155-3 ¶ 37; *id*. at 111.) Costs including "filing fees, mediator fees . . . , ground transportation, copy charges, computer research, and database expert fees . . . are routinely reimbursed" in class action cases. *Alvarado v. Nederend*, No. 1:08–cv–01099 OWW DLB, 2011 WL 1883188, at *10 (E.D. Cal. Jan. May 17, 2011); *Rodriguez v. Danell Custom Harvesting, LLC*, 327 F.R.D. 375, 394 (E.D. Cal. 2018) ("Reasonable expenses may be awarded for travel, postage, telephone, fax, notice, online legal research fees, mediation fees, filing fees and photocopies"); *see also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) ("The reimbursement for travel expenses, both under 28 U.S.C. § 1920 and Rule 54(d), is within the broad discretion of the Court" [citation omitted]).

Because the costs requested are reasonable and do not exceed the amount authorized, the request for litigation costs will be granted in the amount of $77,613.38.

## C.   Service Award

A class representative may "receive a share of class recovery above and beyond [his] individual claim" with a service payment, also known as an "incentive payment." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1811 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for reasonable incentive payments"). However, incentive payments for class representatives are <u>not</u> to be given routinely. The Ninth Circuit observed: "[i]f class representatives

expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Staton*, 327 F.3d at 975 (citations omitted).  Further, "'excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion.'" *Id.* (citation omitted).

The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013).  In evaluating a request for a service payment to a class representative, the Court must consider: "'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced." *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton* 327 F.3d at 977.

The settlement agreement provides that Kang may apply for a service award "not to exceed $15,000." (Doc. 149-1 at 10.)  Kang now requests that the Court approve a service payment in that amount.  (Doc. 155-1 at 21.)

    1.   <u>Time Expended</u>

The Eastern District has awarded service payments for "substantial efforts taken as a class representative when the plaintiff has undertaken at least 30 to 40 hours of work." *Greer v. Dick's Sporting Goods, Inc.*, No. 2:15-CV-01063-KJM-CKD, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks, citation omitted); *see also Emmons v. Quest Diagnostics Clinical Laboratories, Inc.*, No. 1:13-cv-00474-DAD-BAM, 2017 WL 749018, at *8 (E.D. Cal. Feb. 27, 2017) (awarding payments when each plaintiff reported "approximately 30-40 hours assisting their attorneys in the prosecution of this lawsuit" [modification adopted]).  As Kang has neither submitted a declaration to the Court nor provided any other evidence of the time he expended on the matter, this factor does not support approval of a service payment.[14]

---

[14] Previously, the Court indicated that it was Kang's burden to "provide clear and specific evidence demonstrating

### 2.    Actions Taken to Benefit the Class

According to the motion, Kang "made substantial contributions to this litigation, "participating actively in discovery by providing documents to Class Counsel and preparing for and sitting for a lengthy deposition for which he had to take time off from work."  (Doc. 155-1 at 22.)

Lack of substantiation notwithstanding, Kang likely would have taken many of these actions even if proceeding with individual claims.  For example, he would likely have submitted to a deposition if he brought the claims on his own behalf only.  In addition, he would have assisted with discovery even if the action was not filed on behalf of a class.  On the other hand, his actions— including assisting with discovery, reviewing documents, and attending a deposition— undoubtedly benefitted class members, most of whom will receive an automatic payment at the statutory maximum amount.  Kang's actions also resulted in a change in practice by Credit Bureau. Therefore, the identified actions support a service payment for Kang.

### 3.    Workplace Retaliation

The Court may consider whether the named plaintiff has "reasonable fears of workplace retaliation" in evaluating a request for a service payment.  *Staton*, 327 F.3d at 977.  Because Kang is not an employee of Credit Bureau, and therefore cannot suffer workplace retaliation, this factor does not support a service payment.

### 4.    Reputational Risk

Class Counsel assert that Kang "did risk further reputation[al] harm arising from [Credit Bureau's] matching procedures, which went unchanged until the last days of this matter."  (Doc. 155-1 at 22.)  Yet, this risk of reputational harm would exist regardless of whether Kang had elected to file *individual* claims rather than a class action.  Such alleged risk also lacks evidentiary support and is speculative.  The Ninth Circuit observed: "the trial court is not bound to, and should not, accept conclusory statements about 'potential stigma' and 'potential risk,' in the absence of supporting evidence."  *See Wilson v. Telsa, Inc.*, 833 Fed. App'x 59, 62 (9th Cir. 2020) (quoting

---

significant contributions to the litigation of this case."  (Doc. 153 at 11 n.5.)  Nevertheless, Kang did not submit any evidence of his time or work on the litigation.  The Court declines to speculate as to the unidentified time or work Kang may have expended on the action.

1   *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 805 (2009)).  The Ninth Circuit

2   determined a court did not abuse its discretion in reducing a requested class representative payment

3   from $10,000 to $5,000 based on the speculative "risk of reputational injury."  *Id.*  This factor does

4   not support the requested service payment for Kang.

5          5.     Financial Risk

6          Class counsel provides no argument as to any financial risk to Kang.  Thus, this factor does

7   not support the award of a service payment.

8          6.     Amount of the Request

9          Considering the factors set forth above—in particular the actions taken by Kang that

10  resulted in substantial benefit to the classes and a change in practice by Credit Bureau—the Court

11  finds that an incentive award is appropriate.

12         In determining the amount to be awarded, the Court may consider the actions undertaken

13  by the class representative, the fairness of the hourly rate, and how large the incentive award is

14  compared to the average award class members expect to receive.  *See, e.g., Ontiveros v. Zamora*,

15  303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would

16  receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*,

17  No. 2:10-CV-01831-GGH, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive

18  award requested was "reasonably close to the average per class member amount to be received);

19  *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the

20  plaintiff).  Notably, a service payment of $5,000 for the class representative "is presumptively

21  reasonable" in the Ninth Circuit.  *Richardson v. THD At-Home Servs.*, No. 1:14-cv-0273-BAM,

22  2016 WL 1366952, at *13 (E.D. Cal. Apr. 6, 2016); *see also see also Gonzalez v. NCI Group, Inc.*,

23  No. 1:18-cv-00948-AWI-SKO, 2023 WL 373252, at *9 (E.D. Cal. Jan. 24, 2023) ("Courts routinely

24  find rewards in the amount of $5,000 to be reasonable"); *Bellignhausen v. Tractor Supply Co.*, 306

25  F.R.D. 245, 266 (N.D. Cal. 2015) (observing that in the Northern District, "a $5,000 payment is

26  presumptively reasonable").

27                    *a.     Actions of the class representative*

28         In *Alvarado*, this Court noted the class representatives "(1) travelled from Bakersfield to

28

Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." 2011 WL 1883188, at *11.  The Court also noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant."  *Id.*  In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.  *Id.*  Likewise, in *Bond v. Ferguson Enters., Inc.*, the Court found approved payments of $7,500 for the named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and prepared and evaluated the case for mediation, which was a full day session requiring very careful consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class."  No. 1:09–cv–1662 OWW MJS, 2011 WL 2648879, at *15 (E.D. Cal. June 30, 2011).

Similarly, the Northern District determined class representatives failed to justify incentive awards of $10,000 although the plaintiffs reported "they were involved with the case by interacting with counsel, participating in conferences, reviewing documents, and attending the day-long mediation that resulted in the settlement."  *Wade v. Minatta Transport Co.*, No. C10–2796 BZ, 2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).  On the other hand, the Northern District determined a service award of $10,000 was appropriate for a class representative who "sat for depositions, met with attorneys and coworkers throughout the life of the case, withstood five years of litigation, and was in the unique position of still being employed by Converse, Inc. at the commencement of the lawsuit against his employer."  *Chavez v. Converse, Inc.*, No. 15-cv-03746-NC, 2020 WL 10575028, at *1, 7 (N.D. Cal. Nov. 25, 2020).

Although Kang did not attend the mediation sessions, it appears his remaining actions are comparable to the plaintiffs in *Alvarado*, *Bond*, and *Wade*.  However, he seeks a service payment that is?? twice the service payments awarded to those class representatives.  Further, Kang seeks an award greater than what was approved for Chavez, who was in the "unique position" of being a

current employee of the defendant while a class representative.  This factor does not support a conclusion that the amount of service payment requested by Kang is fair or reasonable.

### b.      Comparison of the award to those of the class members

The Ninth Circuit indicated the Court may consider the "proportion of the [representative] payment[s] relative to the settlement amount, and the size of each payment."  *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015); *see also Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016); *see also Emmons,* 2017 WL 749018 at \*9 (awarding class representative payments of $8,000, 14.5 times the average award and 0.3% of the gross settlement of $2.35 million); *Patel v. Trans Union, LLC,* No. 14-cv-00522-LB, 2018 WL 1258194, \*3, 7–8 (N.D. Cal. Mar. 11, 2018) (awarding enhancement payment of $10,000, which was 25 times the average award and 0.125 % of the gross settlement).  For example, in *Rankin*, the Court found a service award of $5,000 was reasonable, observing "the sum is reasonably close to the average per class member amount to be received."  2011 WL 13239039, at \*2.

As previously noted, Kang's requested service award is 15 times higher than the $1,000 payment to each FRCA Class Member and comprises over one percent of the total amount paid to the FRCA Class.  *See Sandoval v. Tharaldson Employee Mgmt*., No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at \*9–10 (C.D. Cal. June 15, 2010) (collecting cases and concluding that plaintiff's request for an incentive award representing one percent of the settlement fund was excessive).  *See also Sanchez v. Frito-Lay, Inc*., No. 1:14-cv-00797-DAD-BAM, 2019 WL 4828775, at \*20–21 (E.D. Cal. Sept. 30, 2019) (recommending $10,000 incentive award payment to named plaintiff be reduced to $7,500), *report and recommendation adopted*, No. 1:14-CV-797-AWI-MJS, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015).  Given the significant disparity between the award to the FRCA Class and Kang's requested service payment—as well as the percentage of the settlement fund— this factor does not support the amount requested, and instead favors a reduction to the service award.

### c.      Reduction of the service award is warranted

A "substantial effort" by a plaintiff is necessary to support a service payment of $10,000 or

more.  *See Coburn v. City of Sacramento,* No. 2:19-cv-00888-AC, 2020 WL 7425345, at *8 (E.D. Cal. Dec. 17, 2020); *see also Amaro v. Gerawan Farming Inc*., No. 1:14-cv-00147-DAD-SAB, 2020 WL 6043936, at *10 (E.D. Cal. Oct. 12, 2020) (awarding a payment of $10,000 to plaintiffs who spent over 370 hours each during the course of the litigation on tasks such as "talking to co-workers, assisting class counsel, attending the mediation, and organizing class members to keep them apprised of the status of [the] case"); *Valentine v. Rehab. Ctr. of Santa Monica Holding Co. GP,* 2021 U.S. Dist. LEXIS 243660, at *13–14 (C.D. Cal. Dec. 20, 2021) (finding the class representative failed to justify a service enhancement of $10,000, though the plaintiff reported 59.5 hours, during which she "was deposed, worked closely with [class] counsel, assisted in the preparation of pleadings, provided factual information and assisted in identifying potential witnesses").

Because the factors discussed above support an incentive award—and the actions of Kang clearly benefited class members—a service payment is appropriate.  But Kang has offered no "clear and specific evidence demonstrating significant contributions to the litigation of this case" as he was instructed to do.  (*See* Doc. 153 at 11 n.5.)  On the other hand, Kang released individual claims for which he did not seek class treatment and such a release may support an increase in the service payment.  *See, e.g., Ontiveros*, 303 F.R.D. at 366.

Considering the foregoing, a service payment of $5,000 for Kang is appropriate in light of the actions taken, benefit to the class, and the sacrifice of his individual claims.  *See Gonzalez*, 2023 WL 373252, at *9 (noting service awards of $5,000 are routinely found reasonable); *see also Vasquez v. Coast Valley Roofing*, 266 F.R.D 482, 490–491 (E.D. Cal. 2010) (finding the requested payment of $5,000 was "reasonable and appropriate").  Thus, the request for a service payment to Kang as class representative will be granted in the modified amount of $5,000.00.

## V.    CONCLUSION AND ORDER

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.    The hearing set for October 25, 2023, is VACATED;

2.    The proposed classes identified in the settlement agreement (Doc. 149-1 at 4, 5) are certified for settlement purposes;

3.   Plaintiff Sung Gon Kang's unopposed motion for final approval of a class action settlement (Doc. 158) is GRANTED, and the Court approves the settlement as fair, reasonable, and adequate;

4.   Named plaintiff Sung Gon Kang is confirmed as class representative; Kang's counsel, Caddell & Chapman, and Francis Mailman Soumilas, P.C., are confirmed as class counsel; and Continental Datalogix is confirmed as the settlement administrator;

5.   Kang's unopposed motion for attorney's fees and costs and for approval of service award and individual settlement (Doc. 155) is GRANTED IN PART;

6.   The Court awards the following sums:

    a.   Class counsel shall receive $1,113,560.50 in attorney's fees and $77,613.38 in expenses.  Class counsel shall not seek or obtain any other compensation or reimbursement from Credit Bureau, Kang, or class members;

    b.   Kang shall receive $5,000 as a service award; and

    c.   Continental Datalogix shall receive $44,139 in settlement administration costs (*see* Doc. 158-2 ¶6).

7.   The parties are directed to effectuate all terms of the Settlement Agreement (Doc. 149-1) and any deadlines or procedures for distribution set forth therein;

8.   This action is DISMISSED with prejudice, with the Court specifically retaining jurisdiction over this action for the purpose of enforcing the parties' settlement agreement; and

9.   The Clerk of the Court is directed to CLOSE this case.

IT IS SO ORDERED.

Dated:   __**October 13, 2023**__            _____*/s/ Sheila K. Oberto*_____
                                              UNITED STATES MAGISTRATE JUDGE